IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAUL GOMEZ,                    )
                              )
            Plaintiff,        )
                              )
     v.                       )    No. 11 C 1793
                              )
LANEL PALMER, DWAYNE          )
JOHNSON, and ANDRIA BACOT,    )
                              )
            Defendants.       )


MEMORANDUM OPINION AND ORDER

In May 2009, Illinois prisoner Raul Gomez ("Gomez")

sustained a gunshot wound when Correctional Officer Dwayne

Johnson ("Officer Johnson") fired a round of buckshot in Gomez's

direction as prison guards were physically separating two

unarmed inmates who had gotten into a scuffle.

In this suit under 42 U.S.C. § 1983, Gomez alleges that

Officer Johnson used excessive force against him and that

Sergeant Lanel Palmer ("Sgt. Palmer") and Nurse Andria Bacot

("Nurse Bacot") were deliberately indifferent to his injuries.

All three Defendants have moved for summary judgment.  I

deny their motions for the reasons stated below.

I.

At the summary judgment stage, I must view the record in

the light most favorable to Gomez and resolve all evidentiary

conflicts in his favor.  *See Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 786 (7th Cir. 2014).  It follows that my account of the facts "is not necessarily accurate in an objective sense but [instead] reflects the evidence through the lens of summary judgment."  *Id*.

A.

On May 20, 2009, Gomez lived in the "E House" at Stateville Correctional Center ("Stateville") on the ninth floor of cells. Around 10:00 am that day, Sgt. Palmer and Correctional Officer Troy Dunlap ("Officer Dunlap") were escorting the fifty-six inmates on Gomez's floor back from the dining hall.  Gomez stood against the railing across from his cell while other inmates were still filing up the stairs.

While Gomez was waiting, two inmates started to fight on the ninth floor walkway close to the stairwell.  Neither inmate had a weapon.  Gomez was standing about ten to fifteen feet away from the fight when it broke out.  Within three or four seconds, Sgt. Palmer and Officer Dunlap ran up the stairs and started to break up the fight.  Sgt. Palmer sprayed the two inmates with mace about fifteen seconds after arriving at the scene.  As Sgt. Palmer and Officer Dunalp were physically separating the two inmates, Gomez heard a gunshot.  He turned to look at Officer Johnson, who was patrolling the catwalk on the opposite wall across from the seventh floor of cells.

2

Gomez heard several inmates curse at Officer Johnson and ask why he had fired. In Gomez's opinion, Sgt. Palmer and Officer Dunlap already had the fight under control when Officer Johnson fired a round of buckshot from his twelve-gauge shotgun. What transpired next is best captured in Gomez's own words:

> When [Officer Johnson] used the pump action on the shot to put another one in the chamber we knew he was trying to scare us or shoot again. And we kind of leaned back. He fired and I ducked and closed my eyes to try to protect my eyes, and I felt an impact on my arm.

Gomez Dep. at 41. A buckshot pellet from Officer Johnson's second shot ricocheted off an unknown object and lodged in Gomez's upper right arm.[1] Gomez said the impact "felt like a punch in my arm" and left a hole in his shirt. *Id*. at 49.

Officer Johnson aimed his second shot in Gomez's direction--i.e., at an angle from the seventh floor catwalk towards the inmates on the ninth floor walkway--rather than at a "black box" target designed to catch warning shots and minimize ricochet. One of the targets was suspended from the ceiling on the same wall as the catwalk. After the second shot, Gomez saw Sgt. Palmer look at Officer Johnson in disbelief as if to say, "Why did you shoot?" *Id*. at 45.[2] The entire incident, from the

---

[1] Gomez's cellmate and neighbor were also struck by buckshot that produced bruising, but did not penetrate the skin.
[2] Officer Johnson's side of the story is that the fight was not under control when he fired two warning shots into the ceiling, not at any prisoners.

start of the fight until the two inmates were placed in handcuffs, lasted about thirty-five to forty seconds.

After the fight, Gomez lifted up his shirt to inspect his wound. He saw "dark discoloration," a bruise about the size of a quarter, and a drip of blood. *Id*. at 51. The actual puncture wound was about "the size of a big apple seed." *Id*. at 52. Gomez showed Sgt. Palmer and Officer Dunlap his wound and requested medical attention. Sgt. Palmer instructed Officer Dunlap to summon a medical technician or nurse as soon as he finished letting the other inmates into their cells.

About five minutes later, Officer Dunlap returned to Gomez's cell with Nurse Bacot. Gomez showed Nurse Bacot his arm and told her, "I got hit when they fired the gun." *Id*. at 91. At this point, there was still fresh blood on Gomez's wound trickling down his arm. Nurse Bacot told Officer Dunlap that Gomez needed to go to the medical unit. Officer Dunlap responded that Gomez could not leave because the E House was being placed on lockdown. Nurse Bacot did not protest or explain to Officer Dunlap that Gomez's situation presented a medical emergency. Nurse Bacot admits, however, that she can seek clearance to transfer inmates to the medical unit at Stateville even during a lockdown.

When Gomez asked Nurse Bacot to place a note in his file so he could receive immediate medical attention after the lockdown,

she responded, "I am not going to write shit." *Id*. at 16.
Gomez then asked Nurse Bacot to clean his arm. She conferred
with Officer Dunlap, but did not respond to Gomez's request.
Gomez then asked Nurse Bacot to provide him with Bacitracin
ointment and a Band-Aid so he could treat his own wound. Nurse
Bacot agreed, but never returned to Gomez's cell with any
medical supplies.[3]

Sgt. Palmer did a walk through on the ninth floor around
2:00 pm, nearly four hours after the shooting incident. Gomez
asked Sgt. Palmer why he had not received any medical supplies
to treat his injury. Sgt. Palmer promised to check with the
medical unit, but never followed up with Gomez. When Sgt.
Palmer spoke with an investigator about three weeks after the
incident, he stated that "between tickets, paperwork, feeding
etc., 2:30 pm [the end of his shift] came fast and he (Palmer)
was unable to check with Gomez." Pl.'s Ex. 25.

Around 6:00 pm, Nurse Bacot returned to the ninth floor to
pass out medications. Gomez asked Nurse Bacot why he had not
received any medical treatment or supplies. She said, "Oh, you

---

[3] Nurse Bacot's side of the story is that Gomez had only a
"superficial scratch" on his arm, for which she gave him
Bacitracin and a Band-Aid from her medical kit. Bacot Dep. at
98-100. After leaving the ninth floor, Nurse Bacot allegedly
explained to Sgt. Palmer how she had treated Gomez's injuries.
*Id*. at 101. According to Nurse Bacot, Gomez did not ask for
treatment in the medical unit or complain about pain. *Id*. at
102, 112.

will be alright," and continued delivering medications. Gomez
Dep. at 17. As Nurse Bacot was about to leave the ninth floor,
Gomez asked for her full name given that she was refusing to
treat his injury. She mumbled something inaudible, laughed, and
walked away.

When Gomez realized he was not going to receive any medical
treatment, he took matters into his own hands:

> I started cleaning out my own arm and that's when I
> noticed that there was something in it. All of this
> time I didn't think there was anything in my arm. I
> thought it was just swelling and a puncture wound.
> When I started to clean it out with soap and water
> over my sink, I went back to the light, turned on the
> light and I started pushing in on it and everything
> and I seen [sic] a piece of metal. And I told my
> celly, man, I got something in my arm. So I extracted
> it with my fingernails and cleaned it out more. Put
> that down, grabbed my sheet, ripped a piece off of it
> and put a bandage on it. And then I started to write
> [an] emergency grievance to the Warden.

*Id*. at 59. Gomez did not tell Sgt. Palmer, Officer Dunlap, or
Nurse Bacot that he had extracted a piece of metal from his
gunshot wound.

In his emergency grievance submitted on May 16, Gomez said
he had been shot by an unidentified correctional officer "for no
reason" and then denied medical treatment. Pl.'s Ex. 18. Gomez
reported that "the catwalk [officer] shot in a crowd of inmates,
whom [sic] had nothing to do with the fight." *Id*. In the
immediate aftermath of the shooting, Gomez showed Officer Dunlap
and an unidentified nurse "a large area of bruises [with] a

medium amount of blood spilling from the wounds." When the nurse returned to the ninth floor about six hours later, Gomez wrote, "I explained that I was in pain and I showed her the bleeding gunshot wounds. She stated that she wanted to help me, but she was told by the staff security not to document any medical treatment for gunshot wounds from any of the inmates. So she refused to treat me and she walked away from my cell." *Id.* Gomez complained that his wounds were becoming infected as he sat in his cell "in pain and bleeding with a torn sheet as a bandage." *Id.*

On May 17, 2009, one day after the shooting, Gomez asked Sgt. Palmer why he had not received any medical supplies. Sgt. Palmer shrugged off Gomez's inquiry. Other than this exchange, Gomez does not recall whether he sought additional medical attention in the three days after sustaining a gunshot wound. During this period, Gomez's wound remained bruised and burned when he ran water over it. Although Gomez could still use his right arm, he experienced more pain when doing so and could not sleep on his right side.

Gomez has also submitted an expert report from Dr. Edward Glaser, M.D., ("Dr. Glaser") a board certified physician in investigational pain management. In Dr. Glaser's opinion, Gomez experienced unnecessary pain on May 16 when he removed the buckshot pellet in his arm without the benefit of a local

anesthetic.  Glaser Dep. at 79.  Gomez also faced an increased
risk of contracting tetanus and other infections while his wound
remained untreated.  *Id.* at 57.

On May 20, 2009, four days after the shooting incident,
Gomez received treatment from Dr. Partha Ghosh ("Dr. Ghosh"),
the Medical Director at Stateville.  Two officers from internal
affairs were present at Gomez's appointment with Dr. Ghosh.
Gomez noticed that the two officers had a copy of his emergency
grievance.  When Gomez explained that he had suffered a gunshot
wound four days earlier, Dr. Ghosh asked why he had not come to
the medical unit immediately.  Gomez responded that Officer
Dunlap blocked him from receiving treatment in the medical unit
because of the lockdown.  Dr. Ghosh said, "Well, this is kind of
an emergency.  You are supposed to be down here as soon as
possible."  Gomez Dep. at 18.  Gomez said it was not his call
and gestured towards the internal affairs officers in the room.

Dr. Ghosh cleaned Gomez's arm, gave him a tetanus shot, and
prescribed an antibiotic.  When Dr. Ghosh asked whether there
was anything in Gomez's arm, Gomez showed him the pellet he had
removed from his arm on the night of the incident.  The internal
affairs officers took a picture of Gomez's arm and confiscated
the pellet and makeshift bandage.  Dr. Ghosh applied a proper
bandage to Gomez's arm and ordered an x-ray.  Gomez saw Nurse
Bacot while he was waiting to be x-rayed a few days after his

appointment with Dr. Ghosh. She gave Gomez a dirty look and accused him of lying about her. Gomez responded, "I ain't lying, you just didn't want to do your job." *Id.* at 103. This was Gomez's last interaction with Nurse Bacot.

On May 21, 2009, one day after his appointment with Dr. Ghosh, Gomez received notice that his emergency grievance had been denied because he already received medical treatment. Gomez forwarded his grievance to a counselor, who denied it as moot on June 8, 2009. A grievance officer denied Gomez's next appeal on July 9, 2009 because she could not "substantiate any staff misconduct." Pl.'s Ex. 19. On July 29, 2009, Gomez appealed his grievance to the Director of the Illinois Department of Corrections ("IDOC"). *Id.*

On October 20, 2009, the Administrative Review Board ("ARB") recommended to the IDOC Director that Gomez's grievance should be denied for the following reason:

> This office notes your allegations were referred to statewide investigations. Investigator [Andrew] Pronger conducted the interviews and conducted forensic testing with Illinois State Police. Pronger concluded you did not present credible evidence of being shot. Photographs of your clothing and alleged gunshot wound were not consistent with previous evidence where inmates were struck by a pellet from a shotgun discharge. In addition, it is noted you stated to Pronger during an interview, "I just wanted some Neosporin and a bandaid."

Pl.'s Ex. 20. The IDOC Director adopted the ARB's recommendation and denied Gomez's grievance on November 3, 2009,

which marked the end of the administrative process.  *See Burrell v. Powers*, 431 F.3d 282, 284 (7th Cir. 2005) (explaining IDOC's three-step grievance procedure).[4]

B.

As a preliminary matter, Nurse Bacot argues that Gomez did not sue her within the two-year limitations period for Section 1983 claims in Illinois.  *See Wallace v. Kato*, 549 U.S. 384, 387 (2007).

The statute of limitations started running when the IDOC denied Gomez's grievance on November 3, 2009.  *See Walker v. Sheahan*, 526 F.3d 973, 978 (7th Cir. 2008) ("[T]he limitations period is tolled while a prisoner completes the administrative grievance process."); *see also* 20 Ill. Admin. Code § 504.850(f) (stating that IDOC Director renders "the final determination of a grievance").

On March 15, 2011, Gomez filed a pro se complaint under 42 U.S.C. § 1983 against the IDOC Director, the Stateville Warden, Sgt. Palmer, Officer Dunlap, "John Doe (catwalk)," and "Jane Doe Med. Tech."  The naming of John and Jane Doe defendants does not

---

[4] I have already rejected Nurse Bacot's argument that Gomez failed to exhaust his administrative remedies because he did not identify her by name in his grievance.  *See* Dkt. No. 95 (citing *Jones v. Block*, 549 U.S. 199, 217 (2007); *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011)).  Despite her urging, I will not revisit this issue at the summary judgment stage.

toll the statute of limitations.  *See Baskin v. City of Des Plaines*, 138 F.3d 701, 704 (7th Cir. 1998).

On August 9, 2011, with 87 days left on the statute of limitations, Judge Shadur dismissed Gomez's case based on appointed counsel's representations that the complaint failed to state any plausible claims and was barred by the statute of limitations.  *See* Dkt. No. 14.  Gomez filed a timely *pro se* notice of appeal.  During his appeal, Gomez could not conduct discovery or amend his complaint in the district court.  *See Aaron v. Mahl*, 550 F.3d 659, 667 (7th Cir. 2008) ("[A] party's filing of a notice of appeal divests the district court of jurisdiction over those aspects of the case involved in the appeal.").  Nurse Bacot has not cited any authority for the proposition that the two-year statute of limitations continued to run during Gomez's appeal.

On June 5, 2012, the Seventh Circuit issued a mandate reinstating Gomez's excessive force claim against "John Doe (catwalk)"; his deliberate indifference claims against Sgt. Palmer and "Jane Doe Med. Tech."; and his First Amendment retaliation claim.  *See Gomez v. Randle*, 680 F.3d 859 (7th Cir. 2012).  Gomez's case was reassigned to me on remand with 87 days left on the statute of limitations.

On August 28, 2012, only three days before the statute of limitations was set to expire, Gomez filed a first amended

complaint identifying Officer Johnson and Nurse Bacot by name for the first time. *See* Dkt. No. 41. Therefore, Gomez's claims are timely even without considering his equitable tolling arguments.

After voluntarily dismissing his retaliation claim, Gomez filed a second amended complaint in which he asserted an excessive force claim against Officer Johnson (Count I) and a deliberate indifference claim against Sgt. Palmer and Nurse Bacot (Count II). *See* Dkt. No. 138. All three Defendants have moved for summary judgment.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[S]ummary will not lie if...the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

### A.

I start with Gomez's claim that Officer Johnson used excessive force against him in violation of the Eighth Amendment.

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Id*. at 7 (quoting *Whitley*, 475 U.S. at 321). "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

The Seventh Circuit has distilled these cases into a two-part inquiry: (1) "whether the force that [Gomez] describes rose above the *de minimis* level" and (2) "whether the actions of [Officer Johnson] were designed expressly for the purpose of

punishing or humiliating [Gomez]." *Filmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004). In other words, Gomez's burden at the summary judgment stage is to present "evidence that 'will support a reliable inference of wantonness in the infliction of pain.'" *Id.* (quoting *Whitley*, 475 U.S. at 322).

Under these standards, Gomez is entitled to a trial. The alleged use of force in this case--firing buckshot from a twelve-gauge shotgun--is plainly more than a *de minimis* use of force. As for whether Officer Johnson fired in a good faith effort to restore order or wantonly, there are factual disputes about where he aimed and why he fired. I cannot grant summary judgment when such pivotal factual questions are genuinely in dispute. *See Lee v. Anderson*, No. 93 C 5654, 1997 WL 106256 (N.D. Ill. Feb. 12, 1997) (Holderman, J.) (denying motion for summary judgment on prisoner excessive force claim because of factual disputes over where prison guard aimed his gun and whether it was necessary to shoot); *Sanchez v. O'Leary*, 90 C 6271, 1993 WL 96117 (N.D. Ill. Apr. 1, 1993) (Moran, J.) (same); *White v. McEwing*, No. 90 C 1463, 1991 WL 127579 (N.D. Ill. July 5, 1991) (Hart, J.) (same); *cf. Fields v. Millan*, No. 11-856-GPM, 2013 WL 6182928, at *4 (S.D. Ill. Nov. 26, 2013) (Murphy, J.) (granting summary judgment to prison guard who, at worst, "was negligent (or even grossly negligent) in failing to line-up his shot in order to hit the shot board").

Officer Johnson says that Sgt. Palmer and Officer Dunlap did not have the fight under control when he fired warning shots into the ceiling.  In contrast, Gomez says the fight was effectively over when Officer Johnson fired his second warning shot in the direction of inmates who were not involved in the fight.  Gomez's claim does not turn on whether Officer Johnson aimed directly at him.[5]  At this stage, the evidence suggests that Officer Johnson fired a second shot at Gomez and other inmates who were cursing at him and questioning why he had fired the first shot.

In sum, accepting Gomez's testimony as true, a jury could find that Officer Johnson's use of force was "wanton and unnecessary" because no reasonable prison official in his position would have perceived a need to shoot at inmates who were not involved in a skirmish between two unarmed inmates that was already under control.  *Hudson*, 503 U.S. at 7.  It follows that Officer Johnson is not entitled to summary judgment on Gomez's excessive force claim.

B.

---

[5] *See Robins v. Meecham*, 60 F.3d 1436, 1440 (9th Cir. 1995) ("Whom the prison officials shot...is not relevant--what is relevant is that they fired a shotgun blast at an inmate.  It is this conduct that the Eighth Amendment is designed to restrain."); *see also Duran v. Sirgedas*, 240 Fed. App'x 104, 112 (7th Cir. 2007) ("[I]f a police officer intends to inflict injury, without justification, the fact that the officer intentionally targets a large group of individuals, as opposed to a specific individual, is irrelevant.").

Gomez's denial of medical care claim against Sgt. Palmer and Nurse Bacot has objective and subjective components. Gomez must present evidence from which a jury could find that (1) his gunshot wound was an objectively serious medical condition and (2) Sgt. Palmer and Nurse Bacot were deliberately indifferent to his injuries. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

1.

"A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.*

Gomez says that his gunshot wound was bruised and bleeding when he showed it to Sgt. Palmer and Nurse Bacot. A jury need not accept Nurse Bacot's competing description of the wound as a "superficial scratch." Bacot Dep. at 98. It is hard to imagine a medical condition whose seriousness would be more obvious-- even to a layperson--than a bleeding gunshot wound. *See Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996) (noting that "a bruised and battered physical appearance" is an objective injury).

Gomez has also presented evidence that he experienced unnecessary pain and an increased risk of infection because of the delay in treating his wound. *See Williams v. Liefer*, 491

F.3d 710, 714-15 (7th Cir. 2007) (holding that in cases of delayed medical treatment, prisoners must present "verifying medical evidence" that delay "caused some degree of harm"); *see also Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (noting that cognizable harms from delayed treatment include actual injury and "serious risk of injury"). Here, Gomez has presented an expert report stating that he experienced unnecessary pain when he was forced to extract the buckshot pellet from his arm without a local anesthetic and faced an increased risk of infection while his wound remained untreated. This report constitutes "verifying medical evidence" from which a jury could find that Gomez suffered harm because of the four-day delay in treating his gunshot wound. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (holding that pain and risk of infection are objectively serious medical conditions).

In short, on the evidence presented, a jury could reasonably find that Gomez's gunshot wound and the resulting pain and risk of infection were objectively serious medical conditions.

2.

Next, Gomez must show that Sgt. Palmer and Nurse Bacot were deliberately indifferent to his medical condition.

"[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of

confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. 837. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. at 842 (internal citation omitted).

Here, Gomez told Sgt. Palmer and Nurse Bacot that he had been shot and showed them his wound while it was still bleeding. The risk to Gomez's health from a gunshot wound was obvious even if neither Sgt. Palmer nor Nurse Bacot knew that a buckshot pellet had lodged in his arm. Indeed, upon examining Gomez in the medical unit four days after the shooting, Dr. Ghosh remarked that Gomez should have received immediate medical attention. The real question is whether a jury could find that Sgt. Palmer and Nurse Bacot, respectively, disregarded the known or obvious risk to Gomez's health.

Sgt. Palmer seeks summary judgment based on the line of cases holding that "if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (citing *Greeno*, 414 F.3d at 656). It is undisputed that Sgt. Palmer

dispatched Officer Dunlap and Nurse Bacot to check on Gomez's injuries immediately after the shooting incident. Had no further information come to Sgt. Palmer's attention, he would have been justified in believing that Gomez was receiving adequate care from medical personnel. Gomez, however, notified Sgt. Palmer about four hours after the shooting that he had not received any medical supplies to treat his injury. Although Sgt. Palmer said he would check with the medical unit, there is no evidence that he did anything to address Gomez's concerns. In fact, Sgt. Palmer later told an investigator that he was too busy with end-of-shift work to follow up with Gomez. A reasonable jury could conclude from these facts that Sgt. Palmer was deliberately indifferent to the medical needs of an inmate whose gunshot wound remained untreated four hours after the incident. *See Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) ("[N]onmedical officials can 'be chargeable with the Eighth Amendment scienter requirement of deliberate indifference' where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

As for Nurse Bacot, there is widely conflicting testimony about how she responded to Gomez's injuries. Gomez's side of the story, which controls my analysis at the summary judgment

stage, is that Nurse Bacot initially wanted to treat him in the medical unit, but failed to seek clearance from prison officials to transport him during the lockdown. When Gomez asked Nurse Bacot to document his injuries, she said, "I am not going to write shit." Gomez Dep. at 16. She agreed to bring Gomez ointment and a bandage, but never followed through on her promise. Gomez inquired again when he saw Nurse Bacot later in the evening. She laughed and said Gomez was going to be fine. In his grievance, Gomez added that Nurse Bacot said she wanted to treat him, but had been instructed "not to document any medical treatment for gunshot wounds from any of the inmates." Pl.'s Ex. 18. On these facts, a jury could find that Nurse Bacot's failure or refusal to provide Gomez with *any* medical treatment for a bleeding gunshot wound was "so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524.

III.

Defendants' motions for summary judgment are DENIED for the reasons stated above.

20

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 3, 2015